**CRAFTEX MILLS, INC. OF PA, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (MARKOWICZ), Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 3, 2006.

Decided June 26, 2006.

Karen L. Domalakes, Frackville, for petitioner.

Eileen A. Pomento, Pottsville, for respondent.

BEFORE: COLINS, President Judge, and SMITH–RIBNER, Judge, and KELLEY, Senior Judge.

OPINION BY President Judge COLINS.

Craftex Mills, Inc. (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board) that affirmed a decision of a Workers' Compensation Judge (Judge) granting the claim petition filed by Thomas Markowicz (Claimant).[1]

The facts as found by the Judge are as follows. Claimant's duties involved the cleaning of an air conditioning system that Employer had installed about six or seven years before Claimant sustained his alleged injury. The new system required Claimant and other employees every six months to enter into a tank, about 200 square feet in size that collected three inches of "muck." The tank had a "swampy" smell that increased over time in between cleanings. Sometime around the year 2000, Claimant began to have breathing problems, specifically shortness of breath that became increasingly worse. He did not have a problem with the old system. Claimant had a lung biopsy performed when he left work on October 5, and alleged that he suffered an occupational disease on that day, his last day of work.

Claimant offered the testimony of his treating physician, Dr. Mengel, who began treating Claimant in August 2002. Dr. Mengel opined that Claimant suffers from hypersensitivity pneumonitis and asthmatic bronchitis as a result of his **exposure to thermophilic actinomyces** in the air conditioning unit. This condition has resulted in Claimant developing an allergy to this substance and he will have it for his lifetime. Dr. Mengel also testified that Claimant's pulmonary functioning is impaired as a result, that he has not recovered, and that he cannot return to his pre-injury job because continued exposure will cause progression of the disease. He testified that he did not know what caused Claimant's condition until he had the lung biopsy and sensitivity test, and had spoken to Claimant and eliminated all other possible causes. He acknowledged that not all air conditioning units contain thermophilic actinomyces.

The Judge found Dr. Mengel's testimony credible. The Judge was impressed by Dr. Mengel's discussion of the diagnosed condition and its epidemiology. Employer did not offer medical testimony, but did provide the testimony of its Safety Coordinator, who stated that the air in the plant is chemically treated on an automatic timer to prevent the growth of mold.

The Judge concluded that Claimant had not carried his burden of proof with regard to proving that he had an occupational disease. She noted that the identified disease is not listed under Section 108 of the Pennsylvania Workers' Compensation Act (Act),[2] and that therefore, in order to establish the existence of an occupational disease under the "catchall" provision, Section 108(n), Claimant was required to establish three things: (1) he was exposed to lung disease by virtue of his employment, (2) that there was a causal relationship between the disease and his employment, and (3) that the incidence of lung disease is substantially greater in his occupation than in the general population. The Judge concluded that Claimant had not established the third element, and therefore that Claimant had not sustained an occupational disease. Nevertheless, the Judge, citing *Gibson v. Workers' Compensation Appeal Board (Armco Stainless)*, 580 Pa. 470, 861 A.2d 938 (2004), concluded that Claimant had established that he sustained a work-related injury under Section 301(c)(1) of the Act,[3] and awarded benefits on that basis.

1. This Court's standard of review of an order of the Board is limited to determining whether substantial evidence supports necessary findings of fact, an error of law was committed, or constitutional rights were violated. 2 Pa.C.S. § 704.

2. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 27.1.

3. 77 P.S. § 411(1).

Employer and Claimant appealed. The Board rejected Employer's argument that the lack of a test showing the actual presence of thermophilic actinomyces at Employer's plant rendered the Judge's decision in error as lacking sufficient **competent** evidence. The Board concluded that the absence of such evidence went to credibility and weight, not competence. The Board also based its decision concerning the absence of the test on the fact that, even if a test had been conducted that showed no presence of the substance, there would be no way the test could show that the substance wasn't present at the time of the injury. The Board also rejected Employer's claim that the expert was biased.

■ In its petition for review of the Board's order, Employer raises the following issues: (1) whether Claimant's lay testimony was competent to support the Judge's determination that Claimant's employment caused his injury where the witness lacked personal experience or special knowledge necessary to identify the agents alleged to have caused his injury; and (2) whether competent expert testimony supports the WCJ's determinations of a causal relationship where the expert's testimony shows that he assumed, without factual basis, that the causative agents were present at Claimant's work place? Employer's primary argument is that the Board, by accepting Dr. Mengel's testimony as competent, has essentially eased Claimant's proper burden of proof by providing Claimant with a presumption similar to the one occupational disease claimants enjoy under Section 301(e) of the Act, which provides:

[i]f it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, **it shall be presumed that the employe's occupational disease arose out of and in the course of his employment,** but this presumption shall not be conclusive.

77 P.S. § 413 (Emphasis added.)

■ The presumption the legislature has granted in the context of occupational disease cases means that a claimant enjoys a presumption of **causation** of his or her disease. However, claimants enjoy this presumption only when it is shown that the claimant suffers from an occupational disease and was employed in an occupation or industry in which the occupational disease is a hazard. *Gomori v. Workmen's Compensation Appeal Board,* 61 Pa.Cmwlth. 164, 433 A.2d 142 (1981). Thus, when a claimant fails to establish that he has an occupational disease or that he worked in an industry in which the disease is a hazard, the claimant enjoys no presumption that the work environment caused his disability. Accordingly, a claimant must provide some evidence showing the nature of the illness or disability and also evidence showing that the hazard existed in the workplace before the disability occurred.

■ As a preliminary matter in occupational disease cases, a claimant must prove that he has an occupational disease, and this burden a claimant must meet in the ordinary fashion, by competent medical testimony. *Purex, Inc. v. Workmen's Compensation Appeal Board (Oden),* 70 Pa.Cmwlth.548, 454 A.2d 203 (1982).

As to proof of the existence of the disease-causing element in the work environment, the courts have accepted lay testimony, as well as other expert testimony, to support a finding that the disease-causing element is present. However, the testimony of a lay person appears to require testimony of personal experience with the illness-causing element and personal knowledge. In *Gibson,* the Supreme

Court discussed the value of lay testimony in great detail. In that case, the Supreme Court concluded that the claimant's testimony, submitted to support the factual issue of exposure (existence of element in workplace), did not constitute substantial evidence in support of that factual issue because he did not have personal knowledge or firsthand experience with the disease-causing element, asbestos: "[N]o witness with firsthand knowledge testified that there was asbestos in the workplace. Mr. Grier simply testified that he saw Decedent near a dusty, cottony material that he was unable to identify." *Gibson,* 580 Pa. at 483–4, 861 A.2d at 946. The Supreme Court concluded that "[t]here simply is a lack of substantial evidence, either competent or sufficient, to support a finding that Decedent's death was caused, in substantial part, by asbestos-related disease." *Gibson,* 580 Pa. at 484, 861 A.2d at 946.

Significantly, the Court, while recognizing the long-standing principle that rules of evidence are relaxed in administrative proceedings, stated

> We believe that another fundamental rule of law is that witnesses must have first-hand knowledge of the subject on which they are testifying for that testimony to be admissible. Stated succinctly, evidentiary Rules 602, 701, and 702 are applicable to agency proceedings in general, including workers' compensation proceedings.

*Id.,* 580 Pa. at 486, 861 A.2d at 947.

Those rules of evidence provide as follows:

> Rule 602. Lack of Personal Knowledge.
> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This Rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses.

Pa.R.E. 602.

> Rule 701. Opinion Testimony by Lay Witnesses.
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness, helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

> Rule 702. Testimony of Experts.
> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

Under any of these standards we cannot conclude that claimant's testimony was competent to support a conclusion that his disability is related to his work. There is simply no way for him to be able to identify the spores that Dr. Mengel testified caused his illness.

■■■ The Court must then consider whether Dr. Mengel's testimony was competent to support the factual determination that Claimant was exposed to the spores at work. As stated under Rule 702, if an expert will help a trier of fact such as the Judge in this case, and if that witness is qualified to testify on a subject by virtue of

his or her knowledge, skill, training, experience, or education, he is capable of providing an opinion relevant to the factual dispute at issue. Accordingly, the question we must consider is whether Dr. Mengel is qualified to offer his opinion based upon his qualifications under Rule 702.

In a case such as this, where a claimant has not satisfied either the two-factor requirement to obtain a presumption in the case of specific occupational diseases or the three-factor requirement in the case of the Section 108(n) catchall provision, and in which an employee's claim is simply that he sustained an injury in the workplace that has caused him disability, i.e., total or partial wage loss, the claimant bears the burden to show by unequivocal medical testimony that he is injured and that the injury arose in the course of his employment. Accordingly, we must consider the nature of Dr. Mengel's testimony. We first recite the following lengthy passages of Dr. Mengel's deposition testimony:

Q. You have had an opportunity to review that study or the surgical report?

A. Yes.

Q. What does it show?

A. It was a biopsy.

. . . .

Q. And what did that show in terms of the pathology?

A. It showed nonnecrotizing granuloma. They were, they demonstrated Langhans giant cells. There was plasma cells, lymphocytes and it was consistent with a hypersensitivity pneumonitis of some etiology.

Q. What is hypersensitivity pneumonitis?

A. It's a reaction of a patient in his lungs to a specific antigen in the atmosphere.

. . . .

Q. What is it about the multiple diagnostic studies that you had reviewed that led you to the conclusion that [Claimant] does indeed suffer from hypersensitivity pneumonitis?

A. The most concrete thing was the biopsy. Now, all of the other stuff supports that diagnosis, the interstitial process, the pulmonary function study, but the biopsy is the key item.

. . . .

Q. Now, doctor, what is the connection, if any, between the hypersensitivity pneumonitis and the patient's employment with Craftex?

A. I think hypersensitivity pneumonitis came from his exposure in the air conditioning units.

Q. Why do you so conclude?

A. Epidemiologically, it's the logical place for him to have been exposed and he has no other exposure.

Q. What leads you to that conclusion?

A. What I know about the disease and what I know about the epidemiology of the process.

Q. What did he tell you in terms of his job activities that supports your conclusion?

A. Well, we went——I didn't know he was an——I didn't know this part of the job. After we got the biopsy, then we went back and talked to him about his job exposure and other exposures in a little bit more detail and realized that then he was climbing around on the inside of these humidification units which are characteristically——which characteristically harbor thermophilic actinomyces.

Q. Can you explain how the type of units that he described, either the air pressure type units of air condition units as a whole that he was required to main-

tain, if you will? How does that harbor the type of fungus, if you will, that resulted in his hypersensitivity pneumonitis?

A. I'm not an air conditioning technician and I get this out of books, but, I do know that the literature states that in these wet units, there are funguses and molds that grow because it's moist, you know, funguses and molds grow in moist places. And the funguses and molds then reproduce by sporulation and they give off these little spores that then float around in the air which people inhale. That's the best I can tell you in terms of technical aspects of units.

Q. You had a chance to review his testimony as well; am I correct?

A. I did.

Q. Now, when he testified before the judge, he did acknowledge that he is not the only one who will normally either repair or service the air conditioning units. Okay?

A. Yes.

Q. My question is, what is it about him that made him more susceptible to development of hypersensitivity pneumonitis compared to other individuals?

A. His immune system.

Q. Can you explain?

A. Some people can live in the stuff forever and never respond to it. Other people have an immune system that will react to it. He essentially is——it's essentially an allergy, if you will, to these spores that he inhales, so that you have to have the right combination of the exposure and the immune system. If you don't have somebody who's going to develop that kind of reaction to it, you will not develop the disease.

. . . .

Q. I'm showing you what I've marked as 8. This is lab work performed on November 7 of 2002?

A. Yes.

Q. Can you tell me what it is?

A. This is a standard hypersensitivity pneumonitis panel. It's a panel that we get to cover common funguses, molds, common——it covers some of the common things that you see in hypersensitivity pneumonitis. And pigeon serum is included because bird-fanciers disease or exposure to birds is a common cause of hypersensitivity pneumonitis. Aspergillus, all of these, aspergillus and some of the other thermophilic things are present in, say, the mushroom sheds, and that's another cause of hypersensitivity pneumonitis.

Q. Let me ask you this way. Is there anything that was shown or demonstrated on that lab study from November 7 of 2002 that will be consistent with the testimony and the opinions that you have rendered so far?

A. Yes, he has precipitating antibodies in his blood to Cephalosprium, and he also has——well, I think that's the key thing. The other has one partial band, Aureobasidium pullulans, but the key thing is the Cephalosporium.

Q. What does that mean?

A. That's just some of the molds, the funguses, the thermophilic actinomyces that are present in circumstances where people will pick up the spores.

. . . .

Mengel Deposition, p. 20–26.

Dr. Mengel added that, although the spores originated in the air conditioning unit, he believed Claimant should not return to the workplace in any capacity because of the likelihood that the air conditioning would spread the spores throughout the entire workplace. Con-

tinuing exposure, Dr. Mengel opined, would "result in progressive disease, progressive pulmonary fibrosis, respiratory failure and ultimately death." Deposition at 32–33.

Dr. Mengel summarized that the reason he believed that Claimant's condition was caused by his workplace environment was:

> He was working in an air conditioner, a wet air conditioner, and that is classic for the development of hypersensitivity pneumonitis because it's classic for exposure to thermophilic actinomyces. And he did not raise birds. He didn't work in the mushroom industry. He didn't——he wasn't a maple bark stripper. He wasn't stripping Sequoia bark. There's a whole list of things that can produce hypersensitivity pneumonitis, but the only thing he was exposed to was the thermophilic actinomyces in the air conditioner. He had no other significant exposure to my knowledge.

Deposition at 43.

Dr. Mengel was clearly qualified to render an opinion as to the nature of Claimant's illness. The sole issue then is whether his testimony is competent to support the determination that Claimant's illness arose during the course of his employment without having hard physical evidence of the presence at the workplace of the illness-causing spores. The strongest aspect of Dr. Mengel's testimony as to causation is his experience and knowledge concerning the places where such spores may be found. Dr. Mengel testified to a reasonable degree of medical certainty that such spores are frequently found in air conditioning units. He also stated that such spores are typically found in a number of other environments, including mushroom houses, tree de-barking facilities, and areas in which pigeons roost. Dr. Mengel, after questioning Claimant about potential sites of exposure, concluded that the only environment to which Claimant was exposed that was likely to contain the spores was the room of the air conditioning unit that Claimant had to clean bi-annually.

The crux of Employer's argument here is that the Judge and Board, by accepting as competent Dr. Mengel's opinion, essentially have rendered Claimant's burden less onerous than that of claimants who have satisfied the three-prong test for non-specified occupational diseases. However, whereas in an occupational disease case in which a claimant enjoys a lesser burden because he does not have to supply unequivocal medical evidence of causation, in this case, Claimant was not relieved of the normal burden of presenting an unequivocal medical opinion on causation. Claimants in occupational disease cases enjoy a presumption of causation when they simply present evidence of a lay person concerning the presence of a disease-causing agent, and when the occupation or industry is known to have such disease-causing agents. Dr. Mengel, a medical expert, testified on the basis of his medical knowledge of the epidemiology of Claimant's diagnosed illness, and in using that knowledge, eliminating all other likely sources of the disease-causing spores. That evidence was competent to satisfy Claimant's burden of proof as to causation.

Accordingly, we believe that the Board did not err in affirming the Judge's decision, and we affirm the Board's order.

### ORDER

AND NOW, this 26th day of June 2006, the order of the Workers' Compensation Appeal Board is affirmed.