IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Chester,            :    CASES CONSOLIDATED
               Petitioner    :
                               :
        v.                   :
                               :
Lydia Zambrana (Workers'     :
Compensation Appeal Board),   :    No. 460 C.D. 2023
               Respondent  :

Lydia Zambrana,            :
               Petitioner    :
                               :
        v.                   :
                               :
County of Chester (Workers'   :
Compensation Appeal Board),   :    No. 497 C.D. 2023
               Respondent  :    Argued: June 3, 2025

BEFORE:   HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE MATTHEW S. WOLF, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON              FILED: June 30, 2025

In these consolidated matters, Lydia Zambrana (Claimant), the widow of Dennis Zambrana (Decedent), and the County of Chester (Employer) petition for review from the April 12, 2023, order of the Workers' Compensation Appeal Board (Board). The workers' compensation judge (WCJ) in this matter granted Zambrana's fatal claim petition after determining that Decedent's death from COVID-19 (COVID) was compensable as a standard work-related injury and as an occupational disease. The Board affirmed the WCJ's determination that Decedent's death was due to a standard work-related injury and reversed the WCJ's

determination that Decedent's death was due to an occupational disease. Upon review, we affirm.

## I. Factual and Procedural Background

On April 20, 2020, and April 27, 2020, Employer issued identical Notices of Workers' Compensation Denial (NCDs) acknowledging Decedent's April 16, 2020, death from COVID but denying benefits "pending further investigation." Certified Record (C.R.) at 297-300.[1] On June 8, 2020, Claimant filed a fatal claim petition asserting that Decedent, a corrections officer at Chester County prison, died from work-related exposure to COVID in March 2020. *Id*. at 7-8. Employer issued an answer denying work-relatedness and this litigation ensued, with the primary dispute being whether Decedent contracted COVID at work or from exposure to family members. *Id*. at 12-13.

## A. Evidence of Domestic Exposure

The following chronology derives from the testimony of Claimant, who is decedent's widow, Decedent's former wife Josepha Pagan (Pagan), and Christina Johannessen (Johannessen), who is Decedent's daughter with Pagan; the WCJ found all three to be credible based on their hearing testimony, which was taken remotely.

Claimant married Decedent in 2001, and they have a daughter, who was 17 years old when Decedent died. C.R. at 88-89. The three lived together in Upper Darby. *Id*. at 89. Decedent was 58 years old and worked for Employer for 28 years; at the relevant time his shift was midnight to 2:15 in the afternoon. *Id*. at 90 & 105. Claimant worked as a school cook in Upper Darby with one other person in the

---

[1] Certified Record (C.R.) references are to electronic pagination.

2

kitchen until March 12, 2020, the last day before schools were closed due to the pandemic. *Id*. at 97-99. They did not go to church or have many social activities outside the house before the pandemic. *Id*. at 112-13. Nobody Claimant knew at her school job tested positive for COVID during the relevant time and neither she, Decedent, nor their daughter was sick before Decedent fell ill in late March 2020. *Id*. at 90-11 & 99.

Johannessen was 29 years old at the time, lived in Maryland, and worked as a nurse. C.R. at 102-03, 204-05, 211-12 & 254-56. She stopped working at the end of February 2020 to prepare for a move to Hawaii with her husband, who is in the military. *Id*. at 256. She went to Mexico for a weekend in late February 2020 and flew back to Pennsylvania, where Decedent picked her up at the airport on March 1, 2020. *Id*. at 258. She stayed at Decedent's household with her one-year-old son Oliver through March 6, 2020, went back to Maryland from March 7 to 8, 2020, and then back to Decedent's house from March 9 to 10, 2020. *Id*. at 260. She then went with Oliver to Florida to see her mother-in-law, where they mostly stayed at home or on her mother-in-law's boat, then returned to Decedent's house on March 18, 2020. *Id*. at 254-59 & 261. Johannessen, her mother-in-law, and Oliver were not sick or tested for COVID during the Florida visit. *Id*. at 106 & 279-80.

Decedent's ex-wife Pagan lives in Philadelphia with her boyfriend and another daughter, both of whom drive to work outside of the house; they were subject to temperature checks at their jobs. C.R. at 221-22 & 228. Pagan is disabled, does not work, and drives to shop and do errands. *Id*. at 223. On or about March 16-17, 2020, Pagan was in the hospital for chest pains and hypertension. *Id*. at 191. She did not have shortness of breath or fever and was not tested for COVID during that hospital stay. *Id*. at 192 & 241. On March 19, 2020, Johannessen stated that she

3

was with Decedent at his home; he had mild cold symptoms, including a runny nose and cough. *Id*. at 263 & 277.

On March 22, 2020, Johannessen and Oliver visited Pagan. C.R. at 193-94 & 198. They then stayed with Decedent between March 23 and 29, 2020. *Id*. at 200, 213, 217 & 265. During that visit, on March 24, 2020, Decedent still felt sick with fatigue and body aches; he told Johannessen that Employer had not provided its workers with masks. *Id*. at 266 & 278. On March 26, 2020, Decedent came home from work still feeling sick. *Id*. at 90-91 & 99. He did not return to work after that. *Id*. at 91. He felt worse and had a fever on March 27-28, 2020. *Id*. at 267.

Meanwhile, on March 26, 2020, Pagan thought she was getting the flu, but she did not have a temperature, felt better the next day, and did not see a doctor. C.R. at 201-02. Johannessen, her husband, and Oliver were not sick and did not get tested for COVID during the relevant period. *Id*. at 218, 271 & 275-76. On March 29, 2020, Pagan was at a hotel with Johannessen and Oliver prior to them moving to Hawaii, and on March 31, 2020, Pagan went with them on a plane to Hawaii; she was not sick at that time. *Id*. at 232 & 276. Pagan had no direct physical contact with Decedent in March 2020. *Id*. at 239. Nobody in Pagan's household or family was sick or tested for COVID in March 2020. *Id*. at 229-34.

On March 30, 2020, Claimant and her daughter began feeling sick; they did not seek medical care but did quarantine in the home. C.R. at 92-93. On March 31, 2020, Decedent was taken by ambulance to the hospital, where he remained in care until his death on April 16, 2020. *Id*. at 91.

4

## B. Evidence of Workplace Exposure

Sue Crane (Crane) testified remotely for Employer at an August 19, 2020, hearing. C.R. at 128. She is Employer's human resources supervisor at the prison. *Id*. On March 14, 2020, the prison set up temperature checks and screening questions for employees. *Id*. at 130-33. The prison also limited its on-site employees to essential workers like the corrections officers and certain administrative workers. *Id*. at 149. Decedent told her on March 29, 2020, that he had felt sick since March 26, 2020, and she subsequently completed an incident report on April 13, 2020. *Id*. at 133-34. She did not do the report initially because Employer was still discussing whether employees with COVID would be covered by workers' compensation. *Id*. at 135. Decedent was the first person at the prison to report symptoms to Crane. *Id*. at 141.

Crane acknowledged that about 10 on-site prison employees and 4 on-site employees from Prime Care, Employer's healthcare provider at the prison, tested positive for COVID between March 30, 2020, and April 22, 2020. C.R. at 139 & 146. Because Employer did not have many tests, after the first four employees tested positive, many other employees were tested off site; Crane did not know how many employees were tested in all so as to calculate a "positivity rate" showing how many employees tested positive in comparison with all employees. *Id*. at 148. However, prior to the pandemic, about 280 people worked at the prison. *Id*. at 163. Once the pandemic began, only employees who got sick were tested. *Id*. at 164. One corrections officer, titled C.O. #3 for privacy purposes, reported symptoms and a temperature on the morning of March 30, 2020. *Id*. at 140. Another officer, C.O. #4, reported symptoms on March 29, 2020, and believed he got sick through contact with C.O. #3. *Id*. at 139-40. Crane believed that at the beginning of April 2020, the

5

prison mandated mask-wearing for all on-site employees. *Id*. at 159. She stated that between the initial group of 14 positive tests and her August 2020 testimony, only one additional employee has gotten COVID, and that case was determined to be from outside exposure. *Id*. at 162.

Crane stated that Employer began testing inmates on March 31, 2020, and between that date and April 29, 2020, 21 inmates tested positive. C.R. at 150. Crane could not state a positivity rate for the inmates but believed that Prime Care would have that information. *Id*. at 151-55. At some point, inmates with COVID were quarantined, but Crane did not recall when that began. *Id*. at 162. Prior to the pandemic, the prison had about 850 inmates. *Id*. at 165.

According to Crane, Decedent was not assigned to a particular cell block because his duties included delivering canteen throughout the prison. C.R. at 161. Crane stated that Decedent was the first person at the prison to show symptoms or test positive. *Id*. at 167. Crane did not know if any inmates got sick before March 31, 2020. *Id*. at 167. She reiterated that after March 14, 2020, anyone who reported symptoms or had a fever when entering the prison were not permitted to work on site. *Id*. at 168.

### C. Medical Evidence

Dr. George Avetian, D.O., testified for Claimant by deposition on September 9, 2020. C.R. at 304. He is board certified in family medicine and served as Delaware County's senior medical advisor since 2011 because Delaware County does not have a health department. *Id*. at 311-13. Before the pandemic, he advised the county on issues like Ebola, flu, and West Nile virus. *Id*. at 313. He is not board certified in infectious diseases but takes continuing education on the subject. *Id*. at

6

315. He spoke and worked daily with Chester County medical authorities during the pandemic and stated that Delaware County followed the Chester County health department on COVID strategies and treatment. *Id*. at 316 & 345. Several of his patients had COVID, and in addition to Decedent, another died from the disease. *Id*. at 320.

Dr. Avetian was Decedent's doctor for 30 years. C.R. at 321. Decedent contacted Dr. Avetian in late March 2020 and after a brief conversation, Dr. Avetian suspected that Decedent had COVID and told him to go to the emergency room (ER). *Id*. at 321-22. Dr. Avetian does not remember the exact date of that call but has a clear recollection of it and that it was on or about March 31, 2020. *Id*. at 321 & 325. His answering service would get his calls and advise him within minutes of those calls; he returned Decedent's call as soon as he got the message, not the next day. *Id*. at 363. ER records show that Decedent was admitted to the intensive care unit on March 31, 2020, in critical condition and requiring intubation. *Id*. at 328. While hospitalized, Decedent sustained septic shock, blood clots common to COVID patients, and kidney failure. *Id*. at 328-29. Dr. Avetian attributed Decedent's death to COVID. *Id*. at 330. Decedent had been at high risk due to compromised immunity from myasthenia gravis, morbid obesity, diabetes, and older age. *Id*. at 330.

Dr. Avetian explained that Decedent was also at risk due to his employment at the prison. C.R. at 331. In his role as county health adviser, Dr. Avetian had participated in meetings with medical authorities on COVID in early February 2020 where the potentially greater impact of COVID on densely populated settings like prisons was discussed. *Id*. at 332. Insufficient amounts of tests and protective equipment were a concern in these early meetings. *Id*. at 334. Crane's testimony that Employer did not have many tests early on was consistent with Dr.

Avetian's experience in Delaware County. *Id*. at 336. He found it "pretty significant" that the first 4 employees Employer tested were positive and that in the first four weeks, Employer had a combined 35 positive tests of inmates and employees, although he acknowledged that without information as to the total number of individuals tested and how many were negative, the data was incomplete. *Id*. at 336-38 & 381. Dr. Avetian stated that even without complete data, his opinion within a reasonable degree of medical certainty was that Decedent "most likely was exposed to [COVID] in his work environment." *Id*. at 340, 346 & 386.

Dr. Avetian explained that given the understanding at the time that the infectious period for COVID was 2-14 days, he believed that the virus "was present in the prison environment long before [Decedent] or others tested positive." C.R. at 341. He stated there could have been infected individuals at the prison who were not symptomatic when Decedent became infected. *Id*. at 379. Dr. Avetian learned of Decedent's death on an April 16, 2020, phone call with Chester County medical authorities, who reported the death of a corrections officer who lived in Delaware County. *Id*. at 345-46. He knew Decedent had been hospitalized and called Decedent's wife, who confirmed the news. *Id*. at 346.

On cross-examination, Dr. Avetian acknowledged that as of his September 2020 deposition, Chester County had fewer COVID cases than Delaware County and that Upper Darby, where Decedent lived in Delaware County, is probably more densely populated than other parts of the county. C.R. at 347. He was generally aware that Decedent's daughter Johannessen and his grandson Oliver had traveled to Florida and visited and stayed at Decedent's home in March 2020 before he got sick. *Id*. at 349. Dr. Avetian acknowledged that if an infected person came into a household, the other people in the house would be at risk, particularly if

8

the incoming person had no symptoms and no reason to take precautions. *Id*. at 355. However, he disagreed that exposure was a higher risk in a household than in a prison because household members have greater control over their behavior and the overall exposure risk is smaller than in the densely populated prison environment. *Id*. at 349-50 & 353-54.

Dr. Avetian acknowledged Crane's testimony that Employer began monitoring, keeping infected workers out of the facility, and quarantining infected inmates on or about March 13, 2020, before Decedent got sick. C.R. at 351. However, he noted that the early weeks of the pandemic were marked by insufficient amounts of tests, personal protective equipment, and other precautions that came along later. C.R. at 351 & 365. He stated that even with the limitations of early testing, a report stating that 33 out of 103 prison inmates throughout Pennsylvania tested positive as of April 22, 2020, reflected a "pretty significant" indication of the high rate of infections in prisons. *Id*. at 373-74. He added that given the ease with which COVID could be transmitted, one or two positive tests in a prison would be problematic at the relevant time. *Id*. at 377.

Dr. Michael Silverman, M.D., testified for Employer in a December 4, 2020, deposition. C.R. at 486. He is board certified in infectious diseases and internal medicine. *Id*. at 491. He has treated COVID patients, given presentations on COVID, and keeps up with the latest information and developments on the disease. *Id*. at 492-93. He opined that because Decedent was evidently the first individual at the prison to develop symptoms, two days before any other reported cases, it was substantially more likely that his exposure was outside the prison and not work related. C.R. at 498 & 512. He pointed to Decedent's various contacts with family members as the more likely cause. *Id*. at 499. He noted that even though

9

Decedent's ex-wife Pagan had not been tested for COVID and there was no evidence in her records of a viral infection when she was hospitalized on March 17, 2020, she could have had or caught a mild case of the disease that contributed to Decedent's exposure. *Id*. at 501-03 & 535. This was so even though Pagan testified that she had no direct contact with Decedent during the relevant period because Decedent's daughter Johannessen and her son Oliver were going back and forth between the two households as well as Maryland and by plane to and from Florida. *Id*. at 499-501. Even though neither Johannessen nor Oliver were sick, they could have been asymptomatic carriers who brought the disease from Pagan or some other source into Decedent's home. *Id*. at 506.

Dr. Silverman stated that household transmission of COVID, particularly before its dangers were known, would have been more of a risk factor than Decedent's job at the prison. C.R. at 507. He acknowledged, however, that prisons were high-risk environments and that the availability of tests and masks could have been limited in the prison setting in the early days of the pandemic. *Id*. at 527-28, 533 & 542. He also acknowledged that there was no evidence that anyone in Decedent's family had COVID before he became sick. *Id*. at 537. He based his conclusions on the premise that Decedent was the first symptomatic case in the prison, which made the subsequent positive tests of 35 individuals at the prison less relevant to determining the cause of Decedent's illness. *Id*. at 540. He added that the understanding was that a person would have to be around a carrier for 15 minutes to become infected and that it was unlikely Decedent was around anyone for that long at the prison, whereas he certainly would have been around family members in his home for that length of time. *Id*. at 540. He acknowledged that the incubation period could be as long as 14 days but declined to opine that some of the individuals

tested at the prison on or about March 31, 2020, could have been carriers as early as March 17, 2020. *Id*. at 541.

On March 8, 2021, the WCJ issued her opinion and order. C.R. at 17-35. The WCJ concluded that Claimant established the work-relatedness and compensability of Decedent's COVID as either an occupational disease or as a standard work-related injury and awarded survivor benefits to Claimant and her daughter. *Id*. at 29-30. On Employer's appeal, the Board issued an April 12, 2023, opinion and order reversing the WCJ's determination that Decedent's COVID was an occupational disease but affirming the WCJ's determination that Decedent's COVID was a standard work-related injury. *Id*. at 50-76. Both parties appealed. This Court consolidated the appeals in a June 23, 2023, Order and denied Employer's application for supersedeas in an August 8, 2023, memorandum opinion and Order. This matter is now ripe for disposition.

## II. Issues

Employer asserts that the WCJ wrongly imposed the burden of proof on Employer to disprove the causation of Decedent's COVID rather than holding Claimant to the proper burden of proof, that the WCJ erred in accepting that COVID can even be an "injury" under the Pennsylvania Workers' Compensation Act (Act),[2] that Dr. Avetian's testimony was incompetent, and that the WCJ's decision was unreasoned. Employer's Br. at i. Claimant argues that the Board erred in reversing the WCJ's determination that Decedent's COVID could be classified as an occupational disease. Claimant's Br. at 25.

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

11

### III. Discussion

### A. Employer's Appeal: Fatal Claim Petition Burden of Proof
### and Compensability of COVID under the Act

"In a fatal claim proceeding, the surviving family member bears the burden of proving that the decedent sustained an injury in the course and scope of employment and that the decedent's death was causally related to the work-related injury."[3] *Kimberly Clark Corp. v. Workers' Comp. Appeal Bd. (Bromley)*, 161 A.3d 446, 450 (Pa. Cmwlth. 2017). Section 301(c)(1) of the Act, 77 P.S. § 411(1), defines an "injury" as:

> an injury to an employe, regardless of his previous physical condition . . . arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury or is aggravated, reactivated or accelerated by the injury; and wherever death is mentioned as a cause for compensation under this act, it shall mean only death resulting from such injury and its resultant effects, and occurring within three hundred weeks after the injury.

*Id*. This Court has confirmed that "persons exposed to a serious risk of contracting a disease commonly known to be highly contagious/infectious and potentially deadly, have been 'injured' for the purpose of receiving compensation under the Act." *Browning-Ferris Indus. of Pa., Inc. v. Workmen's Comp. Appeal Bd. (Jones)*, 617 A.2d 846, 849 (Pa. Cmwlth. 1992).

The doctrine of waiver is applicable to workers' compensation proceedings. *Dobransky v. Workers' Comp. Appeal Bd. (Cont'l Baking Co.)*, 701

---

[3] Our review in a workers' compensation appeal is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. *City of Scranton v. Workers' Comp. Appeal Bd. (Roche)*, 909 A.2d 485, 486 (Pa. Cmwlth. 2006).

A.2d 597, 600 (Pa. Cmwlth. 1997). Accordingly, failure to raise an issue to the Board waives that issue for review by this Court. *Bittinger v. Workers' Comp. Appeal Bd. (Lobar Assocs., Inc.)*, 932 A.2d 355, 359 (Pa. Cmwlth. 2007).

Employer argues that Claimant failed to provide any evidence of workplace causation but that, out of sympathy, the WCJ improperly shifted the burden of proof to Employer to disprove workplace causation rather than holding Claimant to her burden to prove the elements of her claim. Employer's Br. at 16-19. Employer also argues that COVID cannot be a compensable injury under the Act because it is not a "very rare disease," but merely a condition that has been described by the United States Supreme Court as a "hazard of daily life" and a "universal risk" no different from "crime, air pollution, or any number of communicable diseases." *Id*. at 26-27 (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109 (2022) (*per curiam*) (granting opposing party's application for stay of federal Occupational Safety and Health Administration order mandating that employers with more than 100 employees must require workers to get the COVID vaccine or wear a mask and get tested weekly)).

The record includes Employer's issues presented to the Board on appeal. C.R. at 42-46. Employer asserted that the WCJ erred in numerous findings of fact and conclusions of law, many of which are encompassed by the issues Employer raises in its questions presented to this Court. *Id.* However, Employer did not assert to the Board that the WCJ improperly reassigned the burden of proof from Claimant to Employer or that COVID should be excluded from coverage under the Act. *See id*. As such, Employer waived these specific issues for consideration by this Court. *Bittinger*, 932 A.2d at 359.

13

**B. Employer's Appeal: Dr. Avetian's Testimony**

**1. Competence: Factual Foundation**

The competency of medical testimony is a question of law that this Court may address. *Pryor v. Workers' Comp. Appeal Bd. (Colin Serv. Sys.)*, 923 A.2d 1197, 1203 (Pa. Cmwlth. 2006). The doctor's entire testimony must be reviewed and taken as a whole, and a final decision "should not rest upon a few words taken out of context of the entire testimony." *City of Phila. v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 770 (Pa. 2011).

If a doctor's opinion depends solely on false or incorrect information or an assumption contrary to established facts and evidence of record, such as a mistaken understanding of the work incident, it can be deemed incompetent. *Cmty. Empowerment Ass'n v. Workers' Comp. Appeal Bd. (Porch)*, 962 A.2d 1, 8 n.7 (Pa. Cmwlth. 2008); *see also Newcomer v. Workers' Comp. Appeal Bd. (Ward Trucking Corp.)*, 692 A.2d 1062, 1066 (Pa. 1997) (concluding that doctor's testimony on causation lacked competence because it was unsupported by the factual history of the incident).

However, if the doctor's opinion is based on an incomplete (rather than false or inaccurate) grasp of the facts concerning the injury or incident, the defect will go to the WCJ's evaluation of the weight and credibility of the expert's testimony, which may not be disturbed on appeal. *See Degraw v. Workers' Comp. Appeal Bd. (Redner's Warehouse Mkts., Inc.)*, 926 A.2d 997, 1002 & n.4 (Pa. Cmwlth. 2007); *see also Cmty. Empowerment Ass'n*, 962 A.2d at 8 n.7. In a recent case involving workplace exposure to Escherichia coli, or E. coli, an infectious disease, this Court held that a doctor's causation opinion was not defeated by his lack of knowledge or even disregard of some "particular facts" in the case, which

14

went to the weight of his testimony, not its competency. *Rice v. Spirac USA, Inc. (Workers' Comp. Appeal Bd.)* (Pa. Cmwlth., No. 1239 C.D. 2022, filed July 3, 2023), slip op. at 6-7, 2023 WL 4306828, at *4 (unreported).[4]

Here, the WCJ did not specifically opine on the competency of Dr. Avetian's testimony but credited it over Dr. Silverman's testimony for various reasons. C.R. at 27. These included Dr. Avetian's direct role in both Chester and Delaware Counties during the pandemic and his explanation that given the COVID incubation time of 2-14 days, the ease with which the disease could spread in a densely populated prison setting populated by hundreds of inmates and workers, and the number of positive tests when the prison began testing on or about March 30, 2020, it was reasonably likely that Decedent, with his preexisting risk factors, contracted the disease at work before testing began. *Id.* The WCJ overruled Employer's objections to Dr. Avetian's testimony without explanation. *Id.* at 30-34.

The Board, which found no error in the WCJ's rulings, findings, and conclusions after concluding that any factual shortcomings in Dr. Avetian's testimony went to the weight and credibility of his testimony rather than its competence. C.R. at 60-61 n.1. The Board further explained that Dr. Avetian did not need to identify a specific contact at the prison for Decedent's exposure to COVID for his testimony to be competent and sufficient. *Id.* at 74.

Employer maintains that Dr. Avetian's testimony lacked competency because the record contains no evidence of a specific identified contact or exposure at the prison or of anyone at the prison who contracted COVID before Decedent developed symptoms on March 26, 2020. Employer's Br. at 20-21. Employer adds that Dr. Avetian lacked sufficient knowledge of the actual conditions and extent of

---

[4] This unreported opinion is cited for its persuasive value pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

15

COVID at the prison during the relevant time and also lacked information about Decedent's contact with his family members during the relevant time. *Id*. at 21-22. Claimant maintains that Dr. Avetian's testimony and conclusions were competent and sufficiently supported by record evidence. Claimant's Br. at 23.

Dr. Avetian based his testimony on his decades-long relationship with Decedent and his background in family medicine, but primarily on his role as Delaware County's senior medical advisor. C.R. at 311-13. In that capacity, he worked previously on other infectious diseases. *Id*. From the beginning of the COVID pandemic, he worked closely with Chester County's medical authorities on issues affecting both the general population and those in densely populated facilities like prisons. *Id*. at 316 & 345. During those meetings and communications, the greater impact on and faster spread of COVID in those facilities was a specific concern. *Id*. at 332. Based on that knowledge and experience, he found it "pretty significant" that Decedent's prison had 35 positive tests within the first 4 weeks of testing and noted the scarcity of tests and protective equipment during that time. *Id*. at 336-46, 381 & 386. Dr. Avetian acknowledged that Decedent had visits to his home from family members before he became seriously sick, but opined that given the 2-14-day incubation rate, it was more likely that Decedent's exposure was at the prison, with its higher density and positive test rates, than his home, where none of the family members in contact with Decedent were symptomatic or tested for COVID. *Id*. at 340-41, 346, 349 & 386. Dr. Avetian considered those risks lower. *Id*.

As noted, a doctor's competency in this context may be negated if the opinion depends solely on false or incorrect information or an assumption contrary to established facts and evidence of record, such as a mistaken understanding of the

16

work incident or injury. *Cmty. Empowerment Ass'n*, 692 A.2d at 1066. The record does not show this was the case for Dr. Avetian's testimony. His advisory role put him in close contact with the medical authorities in Chester County where Decedent's prison was located, and his testimony that prisons were a specific risk and concern during the relevant period was not refuted. He was not personally or directly involved with Decedent's prison during the relevant period, but he learned of the prison's objective risks and the 2-14-day incubation period from his advisory role. He based his knowledge of the specific numbers of illnesses and positive tests at the prison during the relevant period from Crane's unrefuted testimony, which had been taken before Dr. Avetian's deposition. The evidence simply does not support Employer's position that Dr. Avetian had no factual basis for his opinions, which he delivered to the requisite degree of reasonable medical certainty.

Dr. Avetian acknowledged the possibility that Decedent's exposure was through his home or family as well as the general lack of certainty of many aspects of COVID during the early weeks of the pandemic. However, given his knowledge and experience, he maintained that workplace exposure was the most likely cause of Decedent's illness and death. The instances where Dr. Avetian acknowledged uncertainties in the facts available at the relevant time do not defeat the overall consistency, coherence, and competence of his testimony, which was not based on false or incorrect information or an assumption contrary to established facts and evidence of record. Any purported deficiencies went to the weight and credibility of his testimony, which were for the WCJ to determine, and we cannot say the WCJ erred in relying on Dr. Avetian's opinion. *See Degraw*, 926 A.2d at 1002 & n.4; *Cmty. Empowerment Ass'n*, 962 A.2d at 8 n.7; *see also Rice*, slip op. at 6-7, 2023 WL 4306828, at *4.

17

## 2. Competence: Equivocality

For a claimant's medical evidence to be competent, it cannot be equivocal. *City of Phila. v. Workers' Comp. Appeal Bd. (Seaman)*, 8 A.3d 1004, 1007 (Pa. Cmwlth. 2010). A doctor's testimony is unequivocal if, after providing a foundation, he testifies that he believes or thinks those facts exist and that the result in question came from the assigned cause. *Bemis v. Workers' Comp. Appeal Bd. (Perkiomen Grille Corp.)*, 35 A.3d 69, 72 (Pa. Cmwlth. 2011). The law does not require a doctor's every utterance to be certain, positive, and without reservation or exception. *Id.* Words such as "likely" will not render the doctor's opinion equivocal if the testimony, when read in its entirety, is unequivocal and the doctor does not recant the opinion or belief first expressed. *Id.* Similarly, a doctor's recognition during cross-examination that other events may be the cause of an injury will not negate an otherwise unequivocal opinion. *Carpenter Tech. Corp. v. Workmen's Comp. Appeal Bd. (Wisniewski)*, 600 A.2d 694, 696 (Pa. Cmwlth. 1991).

By contrast, medical testimony is equivocal if, after a review of the entire testimony, "it is found to be merely based on possibilities." *Campbell v. Workers' Comp. Appeal Bd. (Pittsburgh Post Gazette)*, 954 A.2d 726, 730 (Pa. Cmwlth. 2008). When a doctor opines that the underlying cause of a disease or condition is unknown or cannot be definitively determined but the doctor "presumes" that the cause is work-related, such testimony is equivocal and incompetent. *PetSmart, Inc. v. Workers' Comp. Appeal Bd. (Sauter)*, 219 A.3d at 703, 706-07 (Pa. Cmwlth. 2019).

Here, the WCJ did not specifically opine on the equivocality of Dr. Avetian's testimony but credited it over Dr. Silverman's testimony for various

reasons. C.R. at 27. The Board found no error in the WCJ's rulings, findings, and conclusions after concluding that any factual shortcomings in Dr. Avetian's testimony went to the weight and credibility or his testimony rather than its competence. *Id*. at 60-61 n.1.

Employer argues that this case is like *PetSmart*, "given Dr. Avetian's testimony and admission that there were multiple possible causes" of Claimant's exposure to COVID. Employer's Br. at 22-23. Claimant maintains that Dr. Avetian's testimony and conclusions were competent and sufficiently supported by record evidence. Claimant's Br. at 23.

Dr. Avetian explained the reasons for his opinion that Decedent's exposure to COVID was work-related, including the densely populated prison environment, likelihood of asymptomatic carriers in the prison, lack of tests and protective equipment early in the pandemic, and the 35 positive tests close in time to when Decedent's condition would have been in its incubation stage. C.R. at 332-46 & 386. Given the 2 to 14-day incubation period and early stage of the pandemic, he opined that the virus "was present in the prison environment long before [Decedent] or others tested positive." *Id*. at 341. He acknowledged on cross-examination that Decedent could have caught the disease at home, given Johannessen and Oliver's travels between the two households, Maryland, and Florida. *Id*. at 349-55. However, he maintained that the prison environment, with its larger and more random population and limitations on privacy, presented a "greater risk" and was "most likely" the cause here. *Id*. at 340, 346 & 351. He recognized that his opinion relied to a degree on some assumptions, given the uncertainties of the case, but stated that his assumptions were based on his medical knowledge and experience, including in his public advisory role. *Id*. at 356.

19

Based on this record and our case law, Dr. Avetian's testimony was not equivocal. He provided the foundation for his causation opinion, specifically the reasonable belief that prisons posed a greater risk at the time than domestic environments; this was neither a presumption nor a mere possibility. He acknowledged that Decedent could have caught COVID at home, but did not change his opinion that it was "most likely" work-related for the reasons he explained. Any deficiencies went to the weight and credibility of his testimony, which were for the WCJ to determine, and we cannot say the WCJ erred in relying on Dr. Avetian's opinion. *See Degraw*, 926 A.2d at 1002 & n.4; *Cmty. Empowerment Ass'n*, 962 A.2d at 8 n.7; *see also Rice*, slip op. at 6-7, 2023 WL 4306828, at *4.

### C. Employer's Appeal: Reasoned Decision

Section 422(a) of the Act, 77 P.S. § 834, provides that the parties are "entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1047 (Pa. 2003). The WCJ must specify the evidence upon which he or she is relying and state the reasons for accepting that evidence. *Id.* When faced with conflicting evidence, the WCJ must adequately explain the reasons for rejecting or discrediting competent evidence. 77 P.S. § 834. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the WCJ must identify that evidence and explain adequately the reasons for its rejection. *Id.* The WCJ's adjudication shall also "provide the basis for meaningful appellate review." *Id.* Where there is conflicting evidence taken by depositions rather than before the WCJ

20

in person, the WCJ must clearly explain the reasons for crediting one witness over another, such as qualifications, misplaced assumptions, or contradictions in testimony. *Daniels*, 828 A.2d at 1053.

However, the WCJ's prerogative to determine the credibility of witnesses and the weight to be accorded evidence "has not been diminished" by the requirement of a reasoned decision. *Lawry v. Cnty. of Butler (Workers' Comp. Appeal Bd.)*, 310 A.3d 1286, 1290 (Pa. Cmwlth. 2024). This Court has explained:

> While many petitioners challenging an adverse credibility determination would suggest that we review each and every component of the WCJ's reasoning for substantial evidence and reverse or remand if we can find any flaw, we do not believe the reasoned decision requirement takes us so far from the traditional notions of the deference owed credibility determinations.

*Id.*

Here, the WCJ's findings of fact summarized the testimony of all testifying witnesses in this matter. C.R. at 19-26. The WCJ credited Claimant, Johannessen, and Pagan, explaining that their testimonies were consistent during both direct and cross-examinations. *Id.* at 27. The WCJ found Crane credible except as to an unexplained discrepancy concerning whether another corrections officer first had symptoms on March 25, 2020, one day before Decedent, or on March 29, 2020, three days after Decedent. *Id.*

The WCJ provided extensive explanations for her determination to credit Dr. Avetian's testimony over Dr. Silverman's conflicting testimony. *Id.* at 27-29. The WCJ specified Dr. Avetian's decades-long familiarity with Decedent as his treating doctor, which gave him knowledge of the preexisting conditions that created a "nexus" making Decedent particularly vulnerable to COVID; his firsthand experience with the pandemic due to his public advisory role in Delaware and

21

Chester Counties, where Decedent lived and worked, and as to the particular concerns of prisons at that time that made it substantially more likely that Decedent's exposure was work related; and his explanation that COVID was likely present in the prison during Decedent's probable incubation period of 2-14 days, which both doctors agreed upon. *Id.*

By contrast, the WCJ explained that she gave less weight to Dr. Silverman's testimony because even if Decedent was the first to show symptoms, the record included Crane's list of positive tests beginning on March 30, 2020, which meant that COVID was present in prison personnel and inmates during Decedent's probable incubation period before March 26, 2020, which Dr. Silverman identified as the first date COVID could be present in the prison. C.R. at 28. The WCJ also noted Dr. Silverman's lack of the kind of firsthand experience of COVID's impact on prisons during the early pandemic that Dr. Avetian had through his public advisory role and Dr. Silverman's initial belief that one source of Decedent's exposure could be his ex-wife Pagan due to her feeling sick and going to the hospital for chest pains and hypertension, which he later partially recanted when it was pointed out that Pagan stated she had no direct contact with Decedent before he became sick. *Id.* The WCJ did not accept Dr. Silverman's explanation that Decedent's exposure was more likely due to an asymptomatic carrier in his family. *Id.* at 27-29.

Employer argues that the WCJ's decision was insufficiently reasoned because it contained numerous factual errors and ignored evidence against workplace causation, such as that Decedent was the first prison individual to report COVID symptoms beginning on March 26, 2020, if not sooner on March 19, 2020, when he told family members he had a cold. Employer's Br. at 24-26. Employer

22

adds that the WCJ wrongly downplayed Johannessen's travel to Mexico prior to March 1, 2020, and Baltimore from March 6-9, 2020, before she spent time at Decedent's home during the relevant period. *Id.* Claimant's brief does not address this issue. The Board concluded that the WCJ did not err in evaluating the testimony, particularly of the two doctors, or in crediting Dr. Avetian more than Dr. Silverman. *Id.* at 74-75.

We conclude the WCJ's decision is sufficiently reasoned. Contrary to Employer's argument, the WCJ did not ignore Employer's evidence, upon which Dr. Silverman relied, that Decedent was the first individual in the prison to report COVID symptoms. The essence of the WCJ's credibility determinations, which warrant deference, was that, based on the agreed-upon 2 to 14-day incubation period, COVID was probably already in the prison before Decedent reported his symptoms on March 26, 2020, and that Dr. Avetian's familiarity with Decedent's preexisting conditions explained why Decedent may have been more vulnerable than others in the prison. Similarly, the WCJ sufficiently explained why Dr. Avetian's roles as a public health adviser and as Decedent's long-time personal doctor warranted greater weight in this case although he is not board certified in infectious diseases like Dr. Silverman. The WCJ explained why Dr. Silverman's testimony was weakened at least in part by his misplaced assumption that Decedent's ex-wife Pagan was a potential source of Decedent's exposure.

These determinations by the WCJ embody the requirements of the reasoned decision rules set forth in *Daniels*, 828 A.2d at 1053, and Section 422(a) of the Act. As in *Lawry*, Employer seeks to relitigate these determinations, which this Court cannot do as they are supported by the record and consistent with the law. *See* 310 A.3d at 1290. As such, we find no error in the WCJ's written decision.

23

## D. Claimant's Appeal: COVID as an Occupational Disease

Because we find no error in the WCJ's determination that Claimant established the work-relatedness and compensability of Decedent's COVID as a standard work-related injury under Section 301(c)(1) of the Act for purposes of obtaining survivors' benefits, we need not address whether the Board correctly reversed the WCJ's determination that Claimant established COVID to be an occupational disease in the prison context. However, for the purpose of completeness, we briefly address this issue.

Section 301(c)(2) of the Act pertains specifically to occupational diseases, which are a compensable alternative to standard work-related injuries. This provision states: "The terms 'injury,' 'personal injury,' and 'injury arising in the course of his employment,' as used in this act, shall include, unless the context clearly requires otherwise, occupational disease as defined in section 108 of this act[.]" 77 P.S. § 411(2). Section 108 of the Act, 77 P.S. § 27.1, added by the Act of October 17, 1972, P.L. 930, enumerates nearly 20 conditions that are covered occupational diseases, such as cancers common to firefighters, diseases common to coal miners, and diseases arising from workplace exposure to certain hazardous substances like asbestos, arsenic, phosphorous, radioactive materials, and carbon monoxide.

Section 108 also contains a provision stating that an occupational disease may be found if it entails a substance or condition "(1) to which the claimant is exposed by reason of his employment, and (2) which are causally related to the industry or occupation, and (3) the incidence of which is substantially greater in that industry or occupation than in the general population." 77 P.S. § 27.1(n). "The

intent of this subsection is to bring into the fold of coverage each new occupational disease as medical science verifies it and establishes it as such, without the need for special legislative recognition by addition to the scheduled diseases or otherwise." *Fruehauf Corp., Indep. Metal Div. v. Workmen's Comp. Appeal Bd. (Cornell)*, 376 A.2d 277, 279 (Pa. Cmwlth. 1977).

If the claimant's occupation and condition fall within the enumerated occupational diseases or if the subsection (n) burden is met, the claimant is entitled to a presumption of causation and need not meet the standard burden of proof for work-relatedness. *Craftex Mills, Inc. of Pa. v. Workers' Comp. Appeal Bd. (Markowicz)*, 901 A.2d 1077, 1080 (Pa. Cmwlth. 2006). This burden is relatively high as the claimant must show a substantially greater *incidence* of the disease in the relevant industry or occupation, not merely a substantially greater *risk* of the disease. *Landis v. Workmen's Comp. Appeal Bd. (Hershey Equip. Co.)*, 526 A.2d 778, 780 (Pa. 1987) (holding that the claimant failed to show a greater incidence of histoplasmosis, an eye disease, in poultry work). It is not uncommon for a claimant to succeed on a traditional injury or disease claim but fail on an occupational disease claim. *See Pittsburgh Bd. of Educ. v. Workmen's Comp. Appeal Bd. (Perkins)*, 529 A.2d 1166, 1169-70 (Pa. Cmwlth. 1987).

Here, the WCJ determined that Claimant met the burden of proof for both a standard work-related injury and an occupational disease, but did not discuss the differing burdens and qualities of these distinct findings. C.R. at 29. The Board affirmed the WCJ's determination that Claimant established standard compensability but reversed the WCJ's occupational disease determination. *Id.* at 62-63. The Board explained that Dr. Avetian's testimony, while competent and sufficient for purposes of standard compensability, failed to establish "a

25

substantially greater incidence" of COVID infections among prison employees than in the general public. *Id*. at 63.

We agree that the evidence available here lacked sufficient data or information to allow for an occupational disease determination. Dr. Avetian did opine that an April 22, 2020, report concluding that 33 out of 103 Pennsylvania inmates tested positive for COVID reflected a "pretty significant" indication of the high rate of infections in prisons. *Id*. at 373-74. He acknowledged, however, that he did not have information on how many individuals at the prison were tested versus how many tested positive and he acknowledged that early in the pandemic tests were scarce and usually limited to symptomatic individuals. C.R. 351 & 365-66; 373-78. Employer's counsel asked: "We don't know the extent of the problem at the prison based on the limited testing. Isn't that true?" *Id*. at 378. Dr. Avetian responded: "Correct. We don't have the depths of the problem, but we know there is a problem." *Id*.

Rather than establishing a substantially greater incidence of COVID in prison work environments, Dr. Avetian's testimony established only a greater risk of the disease. For example, he stated several times that in densely populated facilities like prisons, "in general, there is more risk than in a household." *Id*. at 351-52. Our Supreme Court found this kind of evidence insufficient in *Landis*, and we see no basis on this record to find otherwise in this case. *See* 526 A.2d at 780. Accordingly, the Board did not err in reversing the WCJ's determination that Claimant established COVID to be an occupational disease as recognized by the Act.

## IV. Conclusion

Given the foregoing, the Board did not err in affirming the WCJ's order granting Claimant's fatal claim petition and awarding survivors' benefits based on the WCJ's determination that Decedent died from COVID that he contracted at Employer's workplace.[5] The Board also did not err in reversing the WCJ's determination that Decedent's COVID constituted an occupational disease. Accordingly, the Board's order is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[5] This case is distinguishable from recent cases involving Philadelphia police officers who unsuccessfully asserted they contracted COVID while working. *See, e.g.*, *Stewart v. City of Phila. (Workers' Comp. Appeal Bd.)*, ___ A.3d ____ (Pa. Cmwlth., No. 490 C.D. 2024, filed Apr. 15, 2025), 2025 WL 1107515. In those cases, the city did not initially deny work-relatedness and paid the officers under an administrative category. When the city stopped the payments, the officers filed reinstatement petitions, which do not require medical evidence regarding causation. *Stevens v. Workers' Comp. Appeal Bd. (Consolidation Coal Co.)*, 760 A.2d 369, 374 (Pa. 2000). The issue in the police officers' cases was whether the city's payments amounted to payments in lieu of compensation and a tacit acceptance of work-related causation; this Court held they did not. Here, the County issued denials, which led Claimant to file a fatal claim petition and present evidence of work-relatedness, which the WCJ accepted.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| County of Chester, | : | CASES CONSOLIDATED |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Lydia Zambrana (Workers' | : | |
| Compensation Appeal Board), | : | No. 460 C.D. 2023 |
| Respondent | : | |
| | | |
| Lydia Zambrana, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| County of Chester (Workers' | : | |
| Compensation Appeal Board), | : | No. 497 C.D. 2023 |
| Respondent | : | |

# **O R D E R**


AND NOW, this 30th day of June, 2025, the April 12, 2023, order of the Workers' Compensation Appeal Board is AFFIRMED.


_____
CHRISTINE FIZZANO CANNON, Judge